**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

THE REVOCABLE TRUST AGREEMENT      )
OF RANDALL S. ELLIS AND TERI L. ELLIS; )
TERI ELLIS, Individually and as Trustee,      )
                                            )
         **Plaintiffs,**      )
                                            )
**v.**      )      **Case No. 21-CV-0076-CVE-SH**
                                            )
**STATE FARM FIRE AND CASUALTY**      )
**COMPANY,  an Illinois Corporation,**      )
                                            )
         **Defendant.**      )

## OPINION AND ORDER

Before the Court are defendant's motion for partial summary judgment (Dkt. # 34); plaintiffs' response to defendant's motion for partial summary judgment (Dkt. # 46); defendant's reply in support of its motion for partial summary judgment (Dkt. # 53); defendant's motion to limit testimony of retained and non-retained experts (Dkt. # 29); plaintiffs' response to defendant's motion to limit testimony (Dkt. # 40); defendant's reply in support of its motion to limit testimony (Dkt. # 51); plaintiff's motion in limine (Dkt. # 32); defendant's response to plaintiff's motion in limine (Dkt. # 38); plaintiffs' reply in support of their motion in limine (Dkt. # 50); defendant's omnibus motion in limine (Dkt. # 31); plaintiffs' response to defendant's omnibus motion in limine (Dkt. # 39); and defendant's reply in support of its omnibus motion in limine (Dkt. # 52).  This case arises from an insurance claim dispute regarding the extent of and coverage for damage to plaintiffs' roof.  Dkt. # 2-1, at 2-7.  On May 22, 2020, plaintiffs Randall Ellis[1] and Teri Ellis filed a petition in the

---

[1]      The Court notes that, based on the suggestion of death, plaintiff Randall Ellis was terminated as a party plaintiff on June 25, 2021, and the Revocable Trust of Randall S. Ellis and Teri L. Ellis and Teri L. Ellis, Trustee, were substituted as plaintiffs.  Dkt. # 19.

District Court of Tulsa County, Oklahoma (Dkt. # 2-1, at 1-9) against defendant State Farm Fire and Casualty Company (State Farm) alleging breach of contract (count 1) and bad faith (count 2). Id. at 2-7. Plaintiffs seek actual and punitive damages based on defendant's alleged breach of contract and bad faith. Id. at 8. On February 22, 2021,[2] defendant properly removed this case to federal court "because there is complete diversity of citizenship and the amount in controversy . . . exceeds the sum or value of $75,000." Dkt. # 2, at 1. Consequently, defendant moves, pursuant to Fed. R. Civ. P. 56, for partial summary judgment on 1) plaintiffs' breach of contract claim as it relates to mold damages; 2) plaintiffs' bad faith claim (count 2); and 3) on the issue of punitive damages. Dkt. # 34.

## I.

The following facts are not in dispute: plaintiffs' property was insured at the relevant time under State Farm policy number 36-CA-R337-8. Dkt. # 34-1, at 1 (State Farm renewal declarations); Dkt. # 46, at 4. Plaintiffs' policy covers "accidental direct physical loss to the property . . . unless the loss is excluded or limited in Section I - Losses Not Insured or otherwise excluded or limited in th[e] policy." Dkt. # 34, at 9; Dkt. # 46, at 4. The policy lists certain exclusions and limitations in "Section I - Losses Not Insured[,]" which states, in pertinent part, State Farm "will not pay for any loss to the property . . . that consists of, or is directly and immediately caused by . . . wear, tear, decay . . . wet or dry rot . . . settling, cracking, shrinking, bulging or expansion of" walls, roofs, or ceilings[.]" Dkt. # 34, at 9; Dkt. # 34-2, at 17-19 (State Farm policy); Dkt. # 46, at 4.

---

[2]     Defendant's notice of removal states that State Farm was served with summons on February 1, 2021; therefore, defendant asserts that it filed its notice of removal within the requisite 30-day period pursuant to 28 U.S.C. § 1446(b). Dkt. # 2, at 1.

Further, the policy states that State Farm "will not pay for, under any part of this policy, any loss that would not have occurred in the absence of [certain excluded events]." Dkt. # 34, at 9; Dkt. # 46, at 4. State Farm "will not pay for such loss regardless of: (a) the cause of the excluded event"; or "(b) other causes of the loss"; or "(c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss"; or "(d) whether the event occurs abruptly or gradually, involves isolated or widespread damage," and so forth. Dkt. # 34, at 9; Dkt. # 46, at 4. Notably, State Farm's policy excludes losses occurring as a result of "neglect, meaning neglect of the insured to use all reasonable means to save and preserve property at and after the time of a loss, or when property is endangered." Dkt. # 34-2, at 20 (State Farm policy).

Additionally, the policy lists fungus as an excluded event, and defines fungus as "any type or form of fungus, including mold, mildew, mycotoxins, spores, scents, or byproducts produced or released by fungi," id. at 5. Accordingly, the policy excludes from coverage 1) "any loss of use or delay in rebuilding, repairing, or replacing covered property, including any associated cost or expense, due to interference at the residence premises . . . by fungus"; 2) "any remediation of fungus, including the cost to: (a) remove the fungus from covered property or to repair, restore, or replace that property"; or "(b) tear out and replace any part of the building structure or other property as needed to gain access to the fungus"; or 3) "the cost of any testing or monitoring of air or property to confirm the type, absence, presence, or level of fungus[.]" Dkt. # 34, at 10; Dkt. # 46, at 4. Finally, the policy states that State Farm will not pay for any loss or expense due to fungus "regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to, or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of loss . . . [including] weather conditions." Dkt. # 34, at 10; Dkt. # 46, at 4.

3

In August 2019, plaintiff Teri Ellis "first discovered water coming into the second floor landing at her [p]roperty[.]" Dkt. # 34, at 11; Dkt. # 46, at 4.  Ms. Ellis "testified that, upon realizing water was infiltrating her home . . . she grabbed items to catch the water, then went to Home Depot [that same night] to rent 'a water extractor machine' and a drying fan to dry the carpet." Dkt. # 46, at 16; Dkt. # 46-12, at 3 (Teri Ellis deposition).

Employees from A-Best Roofing inspected plaintiffs property on September 5 and September 12, 2019.  Dkt. # 46, at 15; Dkt. # 46-1, at 7 (deposition of A-Best Roofing employee Jarod Lane).[3] During these inspections, "A-Best Roofing identified missing shingles, missing ridges, transition flashing that had 'blown up' and interior leaks ar [p]laintiffs' property." Dkt. # 46, at 15; Dkt. # 46-1, at 9.  Consequently, Ms. Ellis initiated an insurance claim with State Farm on September 26, 2019. Dkt. # 34, at 11; Dkt. # 46, at 4.  Ms. Ellis entered the date of discovery as the date of loss because she was unsure of the exact date of loss.  Dkt. # 34, at 11; Dkt. # 46, at 5.  Additionally, on or about October 1, 2019, Ms. Ellis apparently signed a repair authorization agreement, authorizing State Farm preferred vendor, Service Master Recovery by Extreme (Service Master), an independent contractor, to perform necessary repairs.  Dkt. # 34, at 11; Dkt. # 46, at 5.[4]

---

[3]   The Court notes that State Farm states in its reply that the fact that A-Best Roofing employees inspected plaintiffs' roof is not relevant or material, Dkt. # 53, at 2; however, defendant does not dispute that this inspection took place.

[4]   The Court notes that plaintiffs dispute this fact because Ms. Ellis's signature "has not been authenticated[,]" Dkt. # 46, at 5; however, the Court will not consider questions of authenticity as to certain documents at the summary judgment stage.  Moreover, despite disputing the authenticity of the signed document authorizing Service Master to perform certain repairs, plaintiffs claim in their additional undisputed facts that Service Master "estimated the cost to perform water mitigation services" at $1,200.06, and Ms. Ellis "paid $17,000 to Service Master for the use of dehumidifiers and airscrubbers[.]" Dkt. # 46, at 16. Thus, it is implicit in plaintiffs' statement of additional undisputed facts that Ms. Ellis authorized Service Master to perform repairs.

On October 4, 2019, State Farm claim specialist (CS) Michael Grover and team manager (TM) Carmen Richwine performed an initial inspection of the property. Dkt. # 34, at 11; Dkt. # 46, at 5.  "At the inspection, State Farm determined that it would hire an engineer to inspect the roof and the interior to determine the cause of the loss."  Dkt. # 34, at 11; Dkt. # 46, at 5-6.  In a letter dated October 4, 2019, State Farm asked engineering firm, U.S. Forensic, to provide "an objective expert opinion, including supporting rationale," as to the following:  "determine if there is wind and/or hail damage"; "determine if there is any sudden and accidental water damage to the home [interior], and its cause and origin"; and "if there is mold or fungus growth, [determine] its cause and origin."  Dkt. # 46-3, at 1 (State Farm letter to U.S. Forensic).

Soon thereafter, on or about October 24, 2019, Ms. Ellis entered into a contract with a public adjuster firm, Coppermark Consulting Corps, LLC (Coppermark), to "assist [plaintiffs] in the preparation, presentation and settlement" of their insurance claim.  Dkt. # 34-7, at 1 (Coppermark contract); Dkt. # 34, at 12; Dkt. # 46, at 6.  Additionally, on November 4, 2019, Service Master prepared an estimate, which included cleaning various items and an hourly rate for a "hazardous waste/mold cleaning technician[.]"  Dkt. # 46-14, at 1 (excerpt of Service Master estimate).  Thereafter, Ms. Ellis paid Service Master $17,000 for "water mitigation equipment and services."  Dkt. # 46-12, at 5 (Ms. Ellis deposition); Dkt. # 46-15, at 1 (Service Master payment invoice).

On November 13, 2019, Gabriel Alexander, of U.S. Forensic Engineering, inspected plaintiffs' property.  Dkt. # 34, at 12; Dkt. # 46, at 6.  Following Mr. Alexander's inspection, U.S. Forensic prepared a report that was reviewed by CS Grover and TM Richwine on January 6, 2020.  Dkt. # 34, at 12; Dkt. # 46, at 6.  The U.S. Forensic report concludes:

1) The physical evidence observed at the property indicated that the roof coverings of the building were not functionally damaged by hail, heavy precipitation, or wind pressures during the storm event on or about August 26, 2019, and that the cracked and deteriorated roofing covering of the building [was] caused by the as-built configuration of the roof covering system, normal weathering, and long-term expansion and contraction of the roof surface and were unrelated to the reported storm event.

2) The physical evidence observed at the property and the available information indicated that the moisture infiltration that caused the observed moisture stains on the gypsum board ceiling finishes within the interior of the subject building was caused by a failure of the roof covering, flashings, and other roof components under extreme rainfall conditions due to long-term wear and aging and was unrelated to any storm-caused opening in the roof of the building.

Dkt. # 34, at 12; Dkt. # 46, at 6.

On January 17, 2020, Coppermark informed State Farm that State Farm was prohibited from contacting plaintiffs directly, and going forward, all communications should be directed to Coppermark's office. Dkt. # 34, at 12; Dkt. # 46, at 7. The following week, on or about January 24, 2020, State Farm sent Coppermark a copy of the U.S. Forensic report and a letter summarizing the report's findings. Dkt. # 34, at 12-13; Dkt. # 46, at 7. Accordingly, State Farm's letter informed plaintiffs that, with respect to the roof damage portion of plaintiffs' claim, said damage was not covered under the policy. Dkt. # 34, at 13; Dkt. # 46, at 7. On February 12, 2020, CS Grover spoke to Coppermark employee Aubree Tackett, and asked her if she had received the January 24, 2020 partial denial letter and the U.S. Forensic report. Dkt. # 34-4, at 9 (State Farm claim file history). The claim file notes indicate that, as of February 12, 2020,  Ms. Tackett had not yet received State Farm's partial denial letter; however, she did receive the U.S. Forensic report, which CS Grover also sent via email on January 17, 2020 and February 6, 2020, respectively.  Id.  CS Grover also states in the claim file notes that he "discussed [Coppermark's] request for additional living expenses" for Ms. Ellis because she cannot stay in her residence without wearing a mask.  Id.  CS Grover states

in the claim notes that he advised Coppermark that no covered damage had been confirmed; therefore, State Farm is unable to extend additional living expenses.  Dkt. # 34-4, at 9; Dkt. # 34, at 13; Dkt. # 46, at 8.

On February 18, 2020, CS Grover indicated in the claim file notes that he reviewed documents submitted by Coppermark, including a Sworn Statement in Proof of Loss, a repair estimate, and photos.  Dkt. # 34, at 13; Dkt. # 46, at 8.  On February 21, 2020, TM Richwine states in the claim file notes that she also reviewed the documents received from Coppermark.  Dkt. # 34-4, at Dkt. # 34, at 14; Dkt. # 46, at 8.  Coppermark's Sworn Statement in Proof of Loss asserts that the full cost of repair or replacement is \$538, 952.68.  Dkt. # 34-12, at 1.  Notably, Coppermark's repair estimate includes line items for reimbursement for a Service Master invoice, dated November 4, 2019, in the amount of \$29,345.93, and then lists a line item in the amount of \$29,345.93 for "hazardous material remediation."  Dkt. # 34-13, at 11, 24.

On February 25 and 27, 2020, respectively, CS Grover and TM Richwine state in the claim file notes that they reviewed an air quality inspection report from Cox Environmental.  Dkt. # 34, at 14; Dkt. # 46, at 8; Dkt. # 34-4, at 7-8.  The Cox Environmental report, based on an October 2, 2019 inspection of plaintiffs' residence, concludes that samples collected from plaintiffs' residence confirm the presence of unacceptable levels of mold, requiring remediation.  Dkt. # 34-17, at 2, 4-5.  TM Richwine states in the claim file notes that "State Farm decided to schedule another inspection to 'reconcile' the report from Cox Environmental and address whether there was damage to the [p]roperty unrelated to mold."  Dkt. # 34, at 14; Dkt. # 46, at 8; Dkt. # 34-4, at 7.  "On or about February 27, 2020, State Farm sent a letter to Coppermark acknowledging receipt of the Sworn Statement of Proof of Loss, along with Coppermark's estimate, photo report, and several 'exhibits.'"

Dkt. # 34, at 14; Dkt. # 46, at 9.  In the letter, State Farm also acknowledged receipt of the Cox

Environmental report, which "confirmed the presence of mold[,]" and "explained that mold and any

remediation of mold is specifically excluded under the policy."  Dkt. # 34, at 14; Dkt. # 46, at 9.

Additionally, the February 27, 2020 letter "requested access to [p]lainitffs' property to conduct an

additional inspection of all interior finishes to further assess damages." Dkt. # 34, at 14; Dkt. # 46,

at 9. However, according to plaintiffs, Coppermark did not receive that letter until March 19, 2020.

Dkt. # 46, at 9; Dkt. # 46-5, at 1.  Moreover, Ms. Ellis "does not recall receiving the February 27,

2020 letter from her representative, Coppermark.  She does not recall having a conversation with

Coppermark after February 27, 2020 regarding an additional interior inspection and did not know

that State Farm was requesting an additional interior inspection."  Dkt. # 34, at 14-15; Dkt. # 46, at

9.

On April 3, 2020, CS Grover emailed Coppermark to inform plaintiffs that "all costs

associated with mold and mold remediation are not covered under the policy."  Dkt. # 34, at 15; Dkt.

# 46, at 9.  On April 20, 2020, State Farm reviewed a report from Valor Forensic Engineering

Services (Valor), which Coppermark emailed to State Farm on April 17, 2020.  Dkt. # 34, at 15; Dkt.

# 46, at 10; Dkt. # 46-6, at 1.  The Valor report concluded that plaintiffs' roof exhibited signs of hail

and wind damage, and due to the "underlying condition of the roof[,]" that is, extensive cupping and

curling,[5] plaintiffs' roof required replacement rather than localized repair.  Dkt. # 34-20, at 2.  On

April 23, 2020, State Farm decided to send the Valor report to U.S. Forensic to provide a follow up

---

[5]        "Cupping is caused by uneven moisture absorption and drying . . . .  Curling is caused by
natural stresses in the wood that are released when the shake . . .is cut and [is] made worse
by moisture cycling."  Kenton Shepard and Nick Gromicko, Mastering Roof Inspections:
Wood Shakes and Shingles, Part 5, INT'L ASS'N OF CERTIFIED HOME INSPECTORS,
https://www.nachi.org/wood-shakes-shingles-part5-137.htm.

report in response to Valor's rebuttal as to U.S. Forensic's conclusion that plaintiffs' roof damage was not caused by storm-related damage such as wind or hail, see Dkt. # 34-8, at 4. Dkt. # 34, at 15; Dkt. # 46, at 10. On or about July 6, 2020, U.S. Forensic provided to State Farm its supplemental report that, after taking into account Valor's findings, "reaffirm[s] the conclusions and opinions provided in [its] original report." Dkt. # 34-24, at 4; Dkt. # 34, at 15-16; Dkt. # 46, at 11.

On December 30, 2020, CS Grover completed a second inspection of the interior of plaintiffs' property. Dkt. # 34, at 16; Dkt. # 46, at 12. After State Farm's second inspection, on February 19, 2021, defense counsel provided to plaintiffs' counsel a January 22, 2021 State Farm letter and estimate for plaintiffs' covered damage, noting that mold-related damage is not included in the estimate. Dkt. # 46-7, at 1-2 (State Farm January 22, 2021 letter). Moreover, State Farm informed plaintiffs that the cost of covered repairs does not exceed plaintiffs' deductible; therefore, no payment was issued. Id. at 2.

Notwithstanding, plaintiffs allege the following damages under their breach of contract claim (count 1): "loss of use of plaintiffs' insured property . . . [incurring] additional living expense[s] . . . totaling approximately $1,530 per month"; $17,253.88 in damages for payment to Service Master for the use of water mitigation equipment and services"; a $29,345.93 estimate "to remediate mold present in the interior of the insured property"; and "$970.00 in damages relating to mold testing and laboratory analysis[.]" Dkt. # 34, at 16-17; Dkt. # 46, at 12; Dkt. # 34-27 (plaintiffs' answer to defendant's interrogatory). Moreover, in her deposition, Ms. Ellis confirmed that "the reason that she rented an apartment was because the air quality [in her residence] was poor due to mold." Dkt. # 34, at 17; Dkt. # 46, at 12.

Notably, during the course of litigation, plaintiffs retained Carl Martin, an engineering expert, Pat Carrell, "an expert estimator and former [c]atastrophe adjuster[,]" and Dr. Kevin Kloesel, an expert meteorologist." Dkt. # 29-1, at 1-4 (plaintiffs' expert disclosures). Additionally, plaintiffs listed professional engineer Chad Williams (of Valor Forensic Engineering Services) and Greg Cannon (Coppermark) as "non-retained experts[.]" Id. at 4-5. As for defendant's retained experts, in addition to U.S. Forensic engineer, Gabriel Alexander, defendant retained Tammy Stokes, a licensed adjuster and restoration expert with respect to "contents loss", "fire loss", and "water loss[.]" Dkt. # 38-6 (Tammy Stokes curriculum vitae); Dkt. # 38-5 (Tammy Stokes Rule 26 report).

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). "[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery[,]" Fed. R. Civ. P. 56(b), including before any discovery has been conducted. "Movants for summary judgment bear the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." Silverstein v. Federal Bureau of Prisons, 559 F. App'x 739, 752 (10th Cir. 2014); see also Adler v. Wal–Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which

the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

Defendant State Farm moves for partial summary judgment on the following grounds:

*a.    Mold-Related Damages as to Plaintiffs' Breach of Contract Claim (Count 1)*

Defendant requests that the Court grant summary judgment on the issue of mold-related damages, stating that it is "entitled as a matter of law regarding plaintiffs' claim for mold damage." Dkt. # 34, at 17. Specifically, defendant argues that "the policy with respect to the 'fungus' exclusion is not ambiguous . . . [and] the plain and ordinary meaning of the words used in the exclusion must be accepted, and State Farm does not owe any damages related to 'fungus' or mold as it is specifically excluded under [p]laintiffs' policy." Id. at 21. Plaintiffs respond that they "are not seeking to recover damages under a 'claim for mold damage.'" Dkt. # 46, at 18. Plaintiffs further respond that the "focal point of [p]laintiffs' water damage claim" is the "interior water damage and resultant [expenses for] water mitigation [efforts]." Id. at 19. Specifically, plaintiffs argue that they are entitled to recover reimbursement for costs associated with installing air scrubbers and dehumidifiers throughout plaintiffs' home, which was "to mitigate water damage, not eradicate or treat mold." Id.

According to the Supreme Court of Oklahoma, parties to an insurance contract "are at liberty to contract for insurance to cover such risks as they see fit and are bound by the terms of [the]

11

contract and courts will not undertake to rewrite the terms thereof." Dodson v. St. Paul Ins. Co., 812 P.2d 372, 376 (Okla. 1991) (quoting Wiley v. Travelers Ins. Co., 534 P.2d 1293, 1295 (Okla. 1974)). Moreover, "[t]he terms of the parties' contract, if unambiguous, clear, and consistent, are accepted in their plain and ordinary sense . . . .  [Accordingly,] [t]he interpretation of an insurance contract and whether it is ambiguous is a matter of law for the Court to determine and resolve accordingly." Id.  Finally, the Supreme Court of Oklahoma has found that the test for whether contract terms are ambiguous is whether they are "susceptible to two interpretations on [their] face.  This test for ambiguity is applied from the standpoint of a reasonably prudent lay person, not from that of a lawyer." Cranfill v. Aetna Life Ins. Co., 49 P.3d 703, 706 (Okla. 2002) (internal quotations and citations omitted).

Here, plaintiffs' policy states that State Farm "will not pay for, under any part of this policy, any loss that would not have occurred in the absence of . . . fungus." Dkt. # 34-2, at 19-20 (State Farm policy).  The policy contains a "definitions" section on page two, which defines "fungus[,]" and includes "mold" in said definition.  Id. at 5.  Moreover, plaintiffs' policy states that State Farm "will not pay for [mold-related] loss regardless of: (a) the cause of the [mold]"; or "(b) other causes of the loss"; or "(c) whether other causes acted concurrently or in any sequence with the [mold] to produce the loss"; or "(d) whether the event occurs abruptly or gradually, involves isolated or widespread damage," and so forth. Id. at 19.  Finally, the policy excludes from coverage 1) "any loss of use or delay in rebuilding, repairing, or replacing covered property, including any associated cost or expense, due to interference at the residence premises . . . by [mold]"; 2) "any remediation of [mold], including the cost to: (a) remove the [mold] from covered property or to repair, restore, or replace that property"; or "(b) tear out and replace any part of the building structure or other property

as needed to gain access to the [mold]"; or 3) "the cost of any testing or monitoring of air or property to confirm the type, absence, presence, or level of [mold.]" Id. at 20.

The Court finds that State Farm's policy language as to fungus, including mold, is unambiguous, clear, and consistent.  On page two of the policy, State Farm defines "fungus" to include "mold," and this definition is clearly marked in bold under the "definitions" section.  Further, State Farm clearly marks a section as "losses not insured" wherein it states that State Farm "will not pay for . . . fungus"--fungus is bolded, and the policy goes on to list examples of excluded expenses, such as loss of use of the residence due to fungus, remediation of fungus, and the cost of testing for fungus.  The Court finds that these specific policy terms related to fungus are not subject to more than one meaning from a lay person's perspective.  See Cranfill, 49 P.3d at 706.  Thus, the Court accepts the policy terms in their plain and ordinary sense and plaintiffs are bound by the terms of their insurance contract with respect to the mold-related policy coverage exclusions.  See Dodson, 534 P.2d at 376.  In other words, any expenses that plaintiffs incurred that are unequivocally mold-related--e.g., 1) bills from Cox Environmental for mold testing; 2) additional living expenses incurred due to plaintiffs' loss of use of the residence because of unacceptable mold levels; and 3) expenses for "remediat[ing] mold present in the interior of the insured property"--are explicitly excluded from coverage under plaintiffs' policy.  Therefore, the Court finds that defendant's motion for partial summary judgment as to the issue of unequivocal, mold-related damages should be granted.

However, the Court notes that it is not apparent from the record whether certain claimed damages--such as water mitigation equipment and services--are mold-related, or are covered expenses within the meaning of plaintiffs' duty to "use all reasonable means to save and preserve

property at or after the time of loss[.]"  See Dkt. # 34-2, at 20.  For example, Ms. Ellis went to Home Depot in August 2019 to rent water mitigation equipment, and she authorized repairs by Service Master on or about October 1, 2019--both events were before the presence of mold was confirmed at plaintiffs' residence in the October 5, 2019 Cox Environmental report.  Moreover, it is possible that some of the water mitigation equipment and services were performed in areas of the house to prevent, not remediate, mold.  It would be an absurd interpretation of the policy for State Farm to require plaintiffs to use all reasonable means to mitigate a loss, or risk losing coverage, but then not reimburse plaintiffs for the expense of taking reasonable measures to mitigate a loss.  Notwithstanding, the Court finds that the line-drawing as to what are covered water mitigation expenses, and what are excluded mold-related losses, is a question for the jury to determine.

      *b.*    *Bad Faith*

      Defendant argues that it "had a legitimate basis for disputing coverage and summary judgment should be granted on [p]laintiffs' bad faith claim." Dkt. # 34, at 21.  That is, "State Farm relied on the report of a licensed professional engineer.  The engineer concluded the damage to the [p]roperty's roof was not caused by wind or hail, but rather by wear, tear, and deterioration, which are not covered losses under the [p]olicy." Id. at 24.  Plaintiffs respond that "the fact finder could find [d]efendant's conduct was unreasonable, in bad faith, and void of fair dealing." Dkt. # 46, at 22.  Specifically, plaintiffs argue that defendant acted in bad faith when it 1) "voluntarily chose to issue the subject insurance [p]olicy . . . [despite] knowing [that] the roof of the property showed" signs of deterioration and susceptibility to damage; 2) "charged premiums for coverage [d]efendant would never pay due to . . . [a] built-in super exclusion premised on [d]efendant's [definition] of what constitutes wind damage"; 3) "failing to ascertain the true [d]ate of [l]oss"; 4) "applying a

14

functional damage standard to the investigation of [p]laintiffs' claim"; and 5) "selectively relying on U.S. Forensic's findings." Id. at 22-25.

The Oklahoma Supreme Court has held that "an insurer has an implied duty to deal fairly and act in good faith with its insured and that the violation of this duty gives rise to an action in tort for which consequential and, in a proper case, punitive, damages may be sought." Christian v. Am. Home Assurance Co., 577 P.2d 899, 904 (Okla. 1977). "The core of a bad-faith claim 'is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy.'" Flores v. Monumental Life Ins. Co., 620 F.3d 1248, 1255 (10th Cir. 2010) (quoting McCorkle v. Great Atl. Ins. Co., 637 P.2d 583, 587 (Okla. 1981)). To succeed on a bad faith claim, plaintiffs "must present evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good faith belief for withholding payment of [plaintiffs'] claim." Oulds v. Principal Mut. Life Ins. Co., 6 F.3d 1431, 1436 (10th Cir. 1993); accord Shotts v. GEICO Gen. Ins. Co., 943 F.3d 1304, 1314 (10th Cir. 2019). According to the Tenth Circuit, courts generally use a two-step analysis to determine whether a plaintiff has made a sufficient showing of bad faith. Shotts, 943 F.3d at 1314-15. The Court considers 1) "whether there is a legitimate dispute between the insurer and the insured regarding coverage or the value of the claim"; and 2) "if the court determines there is a legitimate dispute between the parties, . . . whether the plaintiff offered specific additional evidence to demonstrate bad faith." Id. at 1315. "The additional evidence required for this showing" may include evidence that 1) "the insurer did not *actually* rely on th[e] legitimate [dispute] to deny coverage"; 2) the insurer "denied the claim for an illegitimate reason"; 3) the insurer "otherwise failed to treat the insured fairly"; and 4) "the insured performed an inadequate investigation of the

claim." Id. (internal quotations and citations omitted) (emphasis and alterations in Shotts, 943 F.3d at 1315).

For step one, the Court finds that there exists a legitimate dispute between plaintiffs and defendant regarding coverage and the total value of the claim. During their first inspection of plaintiffs' property, CS Grover and TM Richwine decided it was necessary to hire a licensed professional engineer to determine the cause of plaintiffs' loss. U.S. Forensic Engineering concluded that plaintiffs' claimed damage was due to wear and tear, rather than storm-caused damage. However, plaintiffs' engineering firm, Valor, concluded that plaintiffs' roof exhibited hail and wind damage, and the condition of plaintiffs' roof necessitated complete replacement. Consequently, State Farm sent the Valor report to U.S. Forensic and requested a supplemental report taking Valor's conclusions into account, and U.S. Forensic reaffirmed its initial conclusions that the damage was due to wear and tear. In other words, State Farm relied on the professional assessment of a licensed engineer that the damage was due to wear and tear, which is explicitly excluded under the policy. Thus, there is a legitimate dispute between plaintiffs and defendant based on the professional opinions of their respective experts.

For step two, the Court finds that plaintiffs have failed to offer sufficient evidence of defendant's bad faith. Plaintiffs present no facts from which a reasonable jury could find that State Farm did not actually rely on the legitimate dispute to deny the claim; denied the claim for an illegitimate reason; treated plaintiffs unfairly; or performed an inadequate investigation. First, plaintiffs' argument that State Farm acted in bad faith by choosing to renew plaintiffs' insurance policy, despite allegedly being aware of the deteriorated condition of plaintiffs' roof, is nonsensical. The policy covers direct accidental loss only. Moreover, the policy terms explicitly exclude wear

and tear; thus, the onus is on the insured--not the insurer--to address the deteriorated condition of their roof, or risk coverage exclusions for wear and tear-related damage.  As to plaintiffs other arguments, there is a dispute as to the cause and extent of covered damage; however, said dispute goes to plaintiffs' breach of contract claim, not bad faith.  Accordingly, it is for the jury to determine 1) whether plaintiffs sustained an accidental direct physical loss covered under the policy; 2) the date of loss; 3) what constitutes covered roof damage under the policy; 4) whether the policy covers complete roof replacement due to the deteriorated state of plaintiffs' roof, and so forth.  In sum, plaintiffs present no evidence that State Farm 1) did not <u>actually</u> rely on a legitimate reason to deny coverage; 2) denied the claim for an illegitimate reason; 3) failed to treat the insured fairly; or 4) performed an inadequate investigation.  On the contrary, the evidence shows that the  parties' engineering experts disagree over the cause of plaintiffs' roof damage, and the Court finds that it was reasonable for State Farm to rely on the professional conclusions of a licensed engineer.  Further, the evidence establishes that State Farm conducted at least three on-site investigations by either State Farm employees or a licensed professional engineer, and State Farm had U.S. Forensic reevaluate its initial findings in light of Valor's conclusions.  Thus, the Court finds that plaintiffs have not met their burden to show specific evidence to demonstrate bad faith, and defendant's motion for partial summary judgment on plaintiffs' bad faith claim (count 2) should be granted.

*c.     Punitive Damages*

Under Oklahoma statute, a jury may award punitive damages "[w]here the jury finds by clear and convincing evidence that . . . [a]n insurer has recklessly disregarded its duty to deal fairly and act in good faith with its insured[.]"  OKLA. STAT. tit. 23, § 9.1(B)(2).  Thus, a punitive damages claim is "dependent upon bad faith for its basis."  Peters v. Am. Income Life Ins. Co., 77 P.3d 1090, 1099 n.9 (Okla. Civ. App. 2002).  Accordingly, plaintiffs' claim for relief based on punitive damages fails as a matter of law, and the Court grants defendant's motion for partial summary judgment as to the issue of punitive damages.

**IV.**

Defendant and plaintiffs move in limine to exclude certain evidence and argument at trial:

*a.     Defendant's Motion to Exclude Certain Retained and Non-Retained Experts*

Defendant "seeks an order excluding the testimony of Chad Williams and Dr. Kevin Kloesel as cumulative, limiting the testimony of [p]laintiffs' non-retained witnesses, and limiting the testimony of [p]laintiffs' experts, Carl Martin, Pat Carrell, and Dr. Kevin Kloesel, at trial, to only those opinions which are disclosed in their expert reports."  Dkt. # 29, at 1.

1.     Relevant Factual Background

Plaintiffs' expert disclosures list three retained experts: professional engineer Carl Martin, adjuster Pat Carrell, and meteorologist Dr. Kevin Kloesel.  Dkt. # 29-1, at 1-4.  Additionally, plaintiffs list two "non-retained experts": Coppermark's founder and public adjuster for the firm, Greg Cannon, and professional engineer Chad Williams, who prepared Valor's April 2020 report (Dkt. # 34-20, at 1-21) that included findings and conclusions as to the cause and extent of plaintiffs' roof damage.  Id. at 4-5.

18

Mr. Williams prepared his report after inspecting plaintiffs' property on February 3 and February 15, 2020, respectively.  Dkt. # 29-2, at 84.  Mr. Williams' report states that his evaluation included: 1) "review of available and applicable weather data"; 2) "review of available and applicable property owner/witness statements"; 3) "review of real property and other available data"; and 4) "visual and tactile evaluation of conditions present at the site."  Id. at 86.  Mr. Williams concluded that "[b]ased on the conditions observed at the time of the site evaluation, indentations consistent with hail and/or other impacts were noted to the metal roof valleys and other rooftop metal[.]" Id. at 84.  Mr. Williams further concluded that "[d]ue to the cupping and curling present to the wood shingles, it is probable that the adjoining shingles will be damaged by repair efforts[.]" Id.  Additionally, Mr. Williams observed "missing and broken shingles consistent with wind damage" and "sections of displaced wood ridge shingles throughout the roof."  Id.  Finally, Mr. Williams noted that "the underlying [deteriorated] condition of the roof represents a limiting factor for the successful completion of repairs.  As such, it is not recommended to attempt localized repair of the wood shingle roof surfaces."  Id.

Mr. Martin, of Engineering Perspective Inc. (EPI), inspected plaintiffs' property on August 19, 2020.  Id. at 2.  Mr. Martin submitted his Rule 26 report on August 4, 2021.  Id. at 1.  Mr. Martin's report states that "the basis of [his] evaluation included the following:" 1) August 19, 2020 site examination with shingle sample collection; 2) "[r]eview of U.S. Forensic [r]eport dated January 2nd, 2020 and weather data"; 3) "[r]eview of Valor Forensic Engineering [r]eport dated April 1, 2020 and weather data"; 4) "[r]eview of San Air Technologies Laboratory [r]eport dated 10/04/2019"; and 5) "[r]eview of Dr. Kevin Kloesel [r]eport dated July 29, 2021[.]" Id. at 2.  Mr. Martin concluded that "many shingles [on plaintiffs' roof] experienced various magnitudes of

19

displacement.  Shingles indicating displacement could have only experienced the displacements found to exist by wind forces." Id. at 5.  Additionally, Mr. Martin's review of Valor's photos "revealed the presence of repeating deformations that could have only been caused by hailstone impacts" at certain levels of impact energy.  Id.  Mr. Martin further concluded that based on the shingle conditions of plaintiffs roof--brittle, deteriorated, displaced from wind--"even relatively low hailstone impact energy exposures in the range reported would result in shingle-related damages." Id.  Additionally, Mr. Martin faults the U.S. Forensic report for "distinguishing between functional and non-functional damage[,]" which "was not listed as part of the work scope of U.S. Forensic." Id.  Crucially, Mr. Martin bases numerous conclusions related to roof damage and moisture infiltration on various weather data, including Dr. Kloesel's report, which Mr. Martin states "provides additional validation of the wind and hail exposures that occurred at the residence on May 26, 2019." Id.  Ultimately, Mr. Martin concluded that "attempting a repair methodology to address the damaged shingles and metals would not be successful.  Additionally, the impact of wind, hail and rain exposures have resulted in areas of moisture infiltration of the dwelling that will require interior repairs." Id.

Dr. Kloesel's July 29, 2021 Rule 26 report states that he is a "specialist in forensic weather data interpretation, weather forecasting and weather decision-support." Dkt. # 29-4, at 32.  Dr. Kloesel based his evaluation on "a review of available weather data and storm reports . . . to assess the weather conditions at [plaintiffs' residence] between 12:00am local time and 3:00am local time on May 26, 2019[.]" Id.  Dr. Kloesel concluded that 1) "[s]upercell severe thunderstorm conditions arrived between 12:35am and 12:38am local time"; 2) the estimated maximum wind speed at plaintiffs' residence was "at least 60 miles per hour with stronger gusts"; 3) "[w]ind direction at the

address would have been variable with this storm"; 4) "[h]ailstone size at the address was likely less than one inch in diameter"; 5) "[r]ainfall occurred at the Ellis home nearly continuously between 12:35am and 2:45am with approximately one-half inch of rain likely"; 6) "[n]o cloud-to-ground lightning strikes were observed to hit at the Ellis home"; and 7) rainfall lasted until approximately 2:40am. Id. at 33-38.

Plaintiffs' expert adjuster, Pat Carrell, submitted his Rule 26 report on August 4, 2021. Dkt. # 29-6, at 6. Mr. Carrell bases the opinions in his Rule 26 report on 1) review of U.S. Forensic, Valor, and EPI professional engineer reports; 2) repair/replacement estimates from State Farm, Coppermark, Epic Roofing, and A-Best Roofing; 3) EagleView Premium Roof Report; 4) a physical inspection of the property; and 5) "[his] discussion with Ms. Ellis in regard to interior water damages resulting from the storm event." Id. at 1. Further, Mr. Carrell states in his report that State Farm's adjuster "included only a portion of the water damages to the interior [and] [t]he State Farm adjuster failed to identify the covered storm damage to the roof." Id. Consequently, Mr. Carrell concluded that "the roof is a total loss due to both covered damages and the repairability factor." Id. at 5.

Additionally, plaintiffs list Greg Cannon (Coppermark) and Chad Williams (Valor) as "non-retained experts[.]" Dkt. # 29-1, at 4. Mr. Cannon's disclosure states:

> It is anticipated [that] Mr. Cannon will offer testimony relating to the scope of storm-caused damage to [p]laintiffs' insured property; the cost to restore the subject property to its pre-loss condition; claims handling; coverage afforded by the at-issue insurance policy; inspection of the [p]laintiffs' insured property; and his research into the storm that is the subject of this litigation.

Id. at 4.  Mr. Williams' disclosure states, "[i]t is anticipated [that] Mr. Williams will offer testimony regarding the opinions expressed in his report, which was previously produced to [d]efendant[.]" Id.; see also Dkt. # 34-20 (Mr. Williams' Valor professional engineer report).

        2.      Cumulative Evidence

Defendant requests that the Court "preclude [p]laintiffs from offering needlessly cumulative and duplicative expert testimony on the issues of weather conditions that existed at the Ellis residence on May 26, 2019 and whether there was weather-related damage to [p]lainitffs' roof shingles."  Dkt. # 29, at 2.  Specifically, defendant argues that 1) "[p]laintiffs have not demonstrated that the testimony of the two engineers listed in their Preliminary Witness List and expert disclosures, Carl Martin and Chad Williams, are different"; and 2) "Dr. Kloesel's report only duplicates the same opinion Mr. Martin already reached regarding the weather data on the date of loss[,]" id. at 3, and "the jury does not need to understand how storms develop . . . in order to understand that a wind and hail storm occurred at [p]laintiffs' property on May 26, 2019[,]" Dkt. # 51, at 3.

With respect to whether Mr. Williams and Mr. Martin's engineering opinions are cumulative, plaintiffs respond that "Mr. Martin's testimony will differ from Mr. Williams' because the inspections occurred 6 months apart."  Dkt. # 40, at 3.  Plaintiffs further respond that, unlike Mr. Williams,  "Mr. Martin will offer expert engineering opinions on the issue of causation, taking into consideration documents, information, and testimony exchanged or created as a result of litigation." Id. at 4.  As to whether Mr. Martin and Dr. Kloesel's expert testimony is cumulative, plaintiffs respond that "Mr. Martin is not qualified to provide meteorological opinions"; however, "Mr. Martin cannot render a scientifically sufficient opinion on causation of damage without an analysis of the

meteorological conditions present at [p]laintiffs' property." Id.  Additionally, plaintiffs proffer that Dr. Kloesel's testimony will "explain radar data and interpretation of such data to the jury, along with scientific meteorological principles associated with supercell severe thunderstorms and EF-1 tornadoes." Id. at 5.

Under Fed. R. Evid. 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . ... confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Testimony is cumulative if it "tend[s] to prove the same thing[.]" Cumulative, BLACK'S LAW DICTIONARY (11th ed. 2019).  In addition, Fed. R. Evid. 702, which governs the admissibility of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts and data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Here, at bottom, both Mr. Martin and Mr. Williams conclude that they observed wind and hail damage to plaintiffs' roof, requiring replacement.  Compare  Dkt. # 29-2, at 84 (Mr. Williams report), with id. at 5 (Mr. Martin report).  The Court notes that Mr. Martin inspected the roof six months after Mr. Williams; however, that goes to the reliability of their respective conclusions, it does not change the fact that both experts' conclusions tend to prove the same thing.  Thus, the Court finds that calling both engineers would result in impermissibly cumulative testimony, but it is for plaintiffs to decide which witness to call.

23

Next, regarding whether Mr. Martin and Dr. Kloesel's testimony is cumulative, the Court finds that Dr. Kloesel's testimony runs the risk of being needlessly cumulative, and, as to radar data interpretation and scientific meteorological principles, is unnecessary and likely a waste of time. Specifically, plaintiffs' breach of contract claim turns on whether their roof damage is due to covered, storm-related damage, or due to excluded damage caused by wear and tear. Necessarily, the fact finder must determine whether a storm severe enough to cause the damage alleged by plaintiffs occurred on or before plaintiff's claimed date of loss. It is within the scope of a professional engineer's expertise, when determining damage causation (including hail and wind damage), to rely on weather reports confirming the presence of a severe storm at the residence. Dr. Kloesel's report and other weather data form part of the "sufficient facts and data" on which an engineering expert may base his opinion as to whether plaintiffs' roof sustained storm-caused damage. The relevant part of Dr. Kloesel's conclusions–that a severe storm affected plaintiffs' residence on May 26, 2019--tends to prove the same thing as plaintiffs' proffered engineering expert testimony. That is, pertinent weather data substantiates Mr. Martin's conclusion that plaintiffs' roof sustained storm-caused damage. Further, testimony as to radar data interpretation and scientific principles of meteorology is not helpful for the jury to determine the key facts at issue in this case and is a waste of time. Accordingly, in the interest of clarity and efficiency, the Court encourages the parties to reach a stipulation as to the date and severity of the at-issue storm. Notwithstanding, the Court finds that Dr. Kloesel's proposed testimony should be limited insofar as it merely re-states the engineering expert's conclusions, or is unhelpful and/or unnecessary for the trier of fact to determine whether plaintiffs' roof damage was caused by a covered, storm-related event.

3.      Rule 26 Expert Opinion Testimony Limitations

Defendant moves, pursuant to Fed. R. Civ. P. 26, to limit plaintiffs' experts, Pat Carrell, Carl Martin, and Dr. Kevin Kloesel, at trial "to testifying solely as to the opinions fully disclosed in their expert reports[,]" which "precludes [p]laintiffs' experts from testifying on bad faith and insurance coverage or policy issues, in addition to any other topics not specifically included in their expert reports." Dkt. # 29, at 7. Plaintiffs respond that "confin[ing] [p]laintiffs' experts to the four corners of the experts' reports is unfair to [p]laintiffs, effectively stripping [p]laintiffs' experts of the opportunity to elaborate or synthesize the opinions contained in their expert reports or address testimony generated through trial." Dkt. # 40, at 6.

As a preliminary matter, because the Court granted defendant's motion for partial summary judgment as to plaintiffs' bad faith claim (count 2) in Part III.b, supra, the Court finds that evidence that is relevant to plaintiffs' bad faith claim only is not admissible.

Further, Rule 26 states, in pertinent part, that a retained expert witness must provide a written report, and the report "must contain [] a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B).  Accordingly, plaintiffs' retained experts were required to disclose all of the opinions to which they will testify at trial.  The Court notes that defendant broadly asserts that Rule 26 precludes plaintiffs' experts from testifying as to "insurance coverage or policy issues[.]" Dkt. # 29, at 7.  However, plaintiffs' adjuster expert, Mr. Carrell, specifically references insurance coverage issues in his Rule 26 report; that is, he opines that State Farm's adjuster failed to account for covered interior and roof damage.  Dkt. # 29-6, at 1. Thus, the Court finds that defendant's motion should be granted in part as to limiting Pat Carrell

(Dkt. # 29-6, at 1-40), Carl Martin (Dkt. # 29-2, at 1-6), and Dr. Kevin Kloesel's[6] (Dkt. # 29-4, at 32-38) trial testimony to the opinions (and the reasons and bases for those opinions) contained in their expert reports.  However, defendant's motion should be denied in part as to a blanket prohibition on expert testimony regarding insurance coverage or policy issues--if an expert makes specific mention of an insurance coverage or policy issue (as Mr. Carrell does) in their Rule 26 report, such testimony at trial does not run afoul of Rule 26.

4.      Plaintiffs' "Non-Retained Experts"

Defendant argues that, because of plaintiffs' failure to comply with Rule 26, Mr. Williams and Mr. Cannon's trial testimony should be limited to lay witness testimony and plaintiffs "should be precluded from referring to Mr. Williams or Mr. Cannon as 'experts[.]'" Dkt. # 51, at 5.  Specifically, defendant argues that neither Mr. Williams nor Mr. Cannon has "submitted an expert report in this litigation . . . [and] [p]laintiffs' description of the 'proposed testimony' for each of the non-retained expert witnesses is deficient."  Dkt. # 29, at 7.  Plaintiffs maintain that, because Mr. Cannon and Mr. Williams "possess knowledge and skills beyond those held by lay people . . . and because they were instrumental in the underlying insurance claim, [p]laintiffs have designated [them] as non-retained expert witnesses."  Dkt. # 40, at 7.

Rule 26 requires a party to disclose the identity of any witness who may be called to provide expert testimony at trial.  In addition to disclosing the identity of such witnesses, if a witness has been "retained or specially employed" to give expert testimony he must submit a report containing a complete statement of his opinions, the basis for his opinions, a list of any exhibits used to support

---

[6]      The Court notes that Dr. Kloesel's trial testimony must also be limited in accordance with the Court's findings in Part IV.a.2, supra.

his opinion, and his qualifications to testify as an expert.  Fed. R. Civ. P. 26(a)(2)(B).  A party's failure to disclose the identity of an expert witness or submit an expert report requires the Court to automatically exclude expert testimony unless the violation of Rule 26(a)(2) was justified or was harmless under the circumstances.  Fed. R. Civ. P. 37(c)(1); <u>see also</u> <u>Woodworker's Supply, Inc., v. Principal Mutual Life Ins. Co.</u>, 170 F.3d 985, 993 (10th Cir. 1999).  Notwithstanding, the expert report requirement does not apply if an expert is considered a "non-retained" expert, and he may testify without submitting an expert report. <u>See</u> 1993 Advisory Committee Notes to Fed. R. Civ. P. 26.

Rule 26(a)(2)(C) requires that, for expert witnesses who do not provide a written report (i.e. non-retained experts), plaintiffs must include in their disclosure to defendant 1) the "subject matter" of the witness's expert opinion testimony; and 2) a "summary of the facts and opinions to which the witness is expected to testify."  However, the applicability of Rule 26(a)(2)(C)'s requirements turns on whether Mr. Cannon and Mr. Williams are lay witnesses within the meaning of Fed. R. Evid. 701, or expert witnesses within the meaning of Fed. R. Evid. 702.  Under Rule 701, "testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception"; "(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue"; and "(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Rule 702 states that a "witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue"; "(b) the testimony is based on sufficient facts or data"; "(c) the testimony is the product of reliable principles and methods"; and "(d) the expert has reliably applied the

27

principles and methods to the facts of the case." Fed. R. Evid. 702; <u>see</u> <u>also</u> <u>Daubert v. Merrell Dow</u> <u>Pharmaceuticals, Inc.</u>, 509 U.S. 579, 589-95 (1993).

Notably, that these witnesses have "particularized knowledge" does not automatically place their testimony within the purview of Rule 702 (and thus subject to Rule 26(a)(2)(C) disclosure requirements). <u>See</u> Fed. R. Evid. 701 advisory committee's note to 2000 amendments ("For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. . . . Such opinion testimony is admitted not because of experience, training, or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business"). Rule 702 creates standards that permit experts with <u>no</u> personal knowledge of any relevant facts of a case to form opinions and testify to those opinions at trial.

Here, plaintiffs appear to believe that because Mr. Cannon and Mr. Williams possess particularized knowledge in the fields of insurance adjusting and engineering, respectively, they must be designated as non-retained experts. <u>See</u> Dkt. # 40, at 7. The Court disagrees. Mr. Cannon and Mr. Williams' proposed testimony is relevant and helpful to the jury because of their personal knowledge related to the at-issue insurance claim only. Under Rule 701, Mr. Cannon and Mr. Williams may testify--as lay witnesses--to their personal knowledge and opinions that were rationally formed based on their perception. Mr. Cannon and Mr. Williams' perceptions will inevitably be

influenced by their particularized knowledge in insurance adjusting and roofing, respectively. Accordingly, Mr. Cannon and Mr. Williams[7] may testify as fact witnesses.

For example, Mr. Cannon may testify to his personal knowledge and perceptions with respect to inspecting plaintiffs' property, representing plaintiffs during the claims process, and so forth. However, Mr. Cannon may not testify to issues or facts of which he has no personal knowledge.  In other words, Mr. Cannon could testify (if he has first-hand knowledge) that, after reviewing plaintiffs' policy and inspecting their property, he advised plaintiffs that, based on his experience as an insurance adjuster, he believed that plaintiffs' damage should be covered under the at-issue policy.  In this example, Mr. Cannon would be testifying to relevant facts that provide background context regarding how the dispute between plaintiffs and defendant developed.  By contrast, Mr. Cannon may not testify definitively that, based on the language and construction of the subject policy, plaintiffs' damage is covered.

Similarly, Mr. Williams may testify to his perception of the condition of plaintiffs' roof when he examined it and whether, based on his professional experience, he believed it required replacement.  Crucially, Mr. Williams may not testify to issues or facts of which he has no personal knowledge, which is one of the key distinctions between an expert (who must comply with Rule 26 disclosures) and a lay witness.

Finally, because Mr. Cannon and Mr. Williams' testimony is admissible pursuant to Rule 701-- which is limited to non-expert testimony of lay witnesses based on their perceptions--the Court finds that referring to Mr. Cannon and Mr. Williams as "experts," when in fact they are non-expert

---

[7]     The Court reminds plaintiffs that, in accordance with the Court's findings in Part IV.a.2, supra, plaintiffs may not elicit cumulative testimony from fact witness Mr. Williams and expert witness Mr. Martin.

fact witnesses, creates a substantial risk of unduly influencing, confusing, or misleading the jury, which is prohibited under Rule 403. See Fed. R. Evid. 403.

In sum, the Court finds that defendant's motion should be granted in part as to limiting plaintiffs to one engineer witness testifying as to the presence of wind or hail damage on plaintiffs' roof and whether the roof required replacement; granted in part as to excluding those parts of Dr. Kloesel's testimony that are cumulative to Mr. Martin's testimony, or are unnecessary and/or unhelpful for the jury to determine whether plaintiffs' roof damage is covered, storm-caused damage; granted in part as to precluding expert testimony that is relevant to plaintiffs' bad faith claim only; granted in part as to limiting plaintiffs' retained experts' trial testimony to the opinions (and the reasons and bases for those opinions) contained in their expert reports; denied in part as to a blanket exclusion of expert testimony pertaining to insurance coverage or policy issues; granted in part as to limiting Mr. Cannon and Mr. Williams' trial testimony to lay witness testimony and precluding plaintiffs from referring to either witness as an "expert."

b.      *Plaintiffs' Motion in Limine*

Plaintiffs request that the Court limit the testimony of defendant's engineering expert, Gabriel Alexander, and Tammy Stokes, defendant's restoration expert. Dkt. # 32, at 1. With respect to Mr. Alexander, plaintiffs argue that 1) "Mr. Alexander is not qualified to provide testimony on the meteorological conditions present at the insured property on May 26, 2019 or August 26, 2019"; and 2) "Mr. Alexander has failed to use sufficiently reliable methodology to reach any meteorological opinions or conclusions about such weather conditions[.]" Id. at 2-3. Regarding Ms. Stokes, plaintiffs argue that she is "unqualified to provide roofing opinions, and any such opinions she maintains would not be helpful to the trier of fact. Accordingly, she should be prohibited from

providing any roofing or causation opinions or any opinions relating to the cost to repair or replace the subject insured roof." Id. at 5.

Defendant responds that Mr. Alexander is "qualified to provide his expert opinion regarding the cause of damage to [p]laintiffs' roof, specifically, whether the damage was caused by wind or hail . . . Mr. Alexander does not purport to offer an opinion on the weather, he simply recounts the weather reports and data as part of the facts he relied upon." Dkt. # 38, at 2-3. Defendant further responds that "Mr. Alexander simply relies on weather data that is the product of reliable principles and methods[,]" id. at 4, including relying on CoreLogic weather data, which "is deemed reliable by experts in the field of meteorology," id. at 3. With respect to Ms. Stokes, defendant responds that "Ms. Stokes is qualified, [based on extensive experience and training,] and is expected to testify, regarding her opinions of [p]laintiffs' alleged interior damages, cost to repair interior damages, and the cause of the damage to the interior of the home." Id. at 5-6. Defendant further responds that "Ms. Stokes will not be testifying regarding the cost of roof repair or replacement." Id. at 8 (emphasis added).

### 1.    Relevant Factual Background

As mentioned in Part I, supra, defendant's engineering expert, Mr. Alexander of U.S. Forensic, inspected plaintiffs' property in November 2019. Dkt. # 34, at 12. Following his inspection, Mr. Alexander prepared a January 2, 2020 report on behalf of U.S. Forensic. Id. Mr. Alexander "reviewed and considered the following references and information when preparing [his] report": 1) site inspection of plaintiffs' residence; 2) Tulsa County Property Appraiser's website; 3) "[w]eather from the Weather Underground website"; 4) "Forest Products Laboratory and U.S.

Department of Agriculture"; and 5) "2014 National Roofing Contractors Association (NRCA) Roofing Manual[.]" Dkt. # 34-8, at 3.  Mr. Alexander's report concludes:

> 1) The physical evidence observed at the property indicated that the roof coverings of the building were not functionally damaged by hail, heavy precipitation, or wind pressures during the storm event on or about August 26, 2019, and that the cracked and deteriorated roofing covering of the building [was] caused by the as-built configuration of the roof covering system, normal weathering, and long-term expansion and contraction of the roof surface and were unrelated to the reported storm event.

> 2) The physical evidence observed at the property and the available information indicated that the moisture infiltration that caused the observed moisture stains on the gypsum board ceiling finishes within the interior of the subject building was caused by a failure of the roof covering, flashings, and other roof components under extreme rainfall conditions due to long-term wear and aging and was unrelated to any storm-caused opening in the roof of the building.

Id. at 4.  Further, under "weather information," Mr. Alexander summarizes CoreLogic[8] weather data as to hail: "CoreLogic documented no hail in the area of the property on August 26, 2019. Furthermore, CoreLogic reported no hail at this location in calendar year 2018 or 2019.  CoreLogic documented 3 hail events between January 2009 and 2019 with no reported hail greater than 1.1 inches in diameter."  Id. at 6.  Additionally, Mr. Alexander summarizes CoreLogic weather data as to wind speeds: "Core Logic documented no elevated wind speeds in the area of the property on August 26, 2019.  Furthermore, CoreLogic reported no wind speeds greater than 70 miles per hour at [plaintiffs' residence] in calendar [years] 2017, 2018, or 2019."  Id.

After reviewing Mr. Williams' (Valor) report, defendant requested that U.S. Forensic provide a follow up report in response to Mr. Williams' rebuttal as to Mr. Alexander's conclusion that plaintiffs' roof damage was not caused by storm-related damage such as wind or hail.  Dkt. # 34, at

---

[8]    According to its website, CoreLogic is a data analytics service provider with various products, including weather verification services.  See https://www.corelogic.com/why-corelogic/.

32

15.   On July 6, 2020, Mr. Alexander supplemented his original report, reaffirming the opinions and conclusions contained therein.  Dkt. # 38-1, at 7 (U.S. Forensic supplemental report).  Additionally, in response to criticism from Mr. Williams, Mr. Alexander addressed his reliance on CoreLogic weather data.  Dkt. # 38-1, at 8.  Specifically, Mr. Alexander cites to a 2017 Insurance Journal article by Dr. Daniel Betten, "princip[al] scientist for meteorology" at CoreLogic.  Id.  Mr. Alexander excerpts relevant portions of Dr. Betten's article, namely, his discussion of CoreLogic's "hail verification technology[,]" which synthesizes "radar data, public and social media reports, and the expertise of experienced meteorologists . . . .  [CoreLogic] preserve[s] the granularity in the radar data by using a sophisticated . . . algorithm to continuously fill in the reflectivity data gaps every few seconds.   This comprehensive approach consistently provides 500-meter resolution with neighborhood-level detail."  Id.

In addition to Mr. Alexander, defendant retained Tammy Stokes, "a disaster restoration specialist and construction general contractor[.]" Dkt. # 38-5, at 1.  Ms. Stokes holds an active adjuster license in Oklahoma.  Dkt. # 32-6 (National Association of Insurance Commissioners license lookup search results).  Further, according to her curriculum vitae, Ms. Stokes has been the owner and general manager of Oklahoma Disaster Restoration since 1995.  Dkt. # 38-6, at 1.  Ms. Stokes holds over 20 certifications from restoration industry professional organizations, including "Contents Loss Specialist"; "Fire Loss Specialist"; and "Water Loss Specialist[.]" Id.  In her Rule 26 report, Ms. Stokes states that her company "has performed thousands of property restoration projects . . . [involving] buildings and homes [that] have sustained damage caused by fire, water, mold and storm damage, including wind and hail events."  Dkt. # 38-5, at 2.

Ms. Stokes' August 29, 2021 expert report relied upon 1) "standard and reference guide for professional water damage restoration"; 2) "standard and reference guide for professional mold remediation"; 3) Restoration Industry Association (RIA) code of ethics; 4) Mr. Alexander's engineering report; 5) Mr. Alexander's supplemental report; 6) Mr. Carrell's (adjuster) report and estimate; 7) Coppermark estimate; 8) Service Master Extreme water mitigation report; 9) Service Master Extreme estimate for mold; 10) Mr. Martin's (engineer) report; 11) Mr. Williams' (engineer) report; 12) Cox Environmental (mold) report; 13) SanAir Technologies (mold) laboratory report; 14) Dr. Kloesel's (meteorologist) report; 15) State Farm inspection and estimate dated January 22, 2021; and 16) A-Best Roofing inspection and estimate. Id. at 1. Ms. Stokes makes five overarching conclusions in her report: 1) plaintiffs' roof "was in substantially the same condition both before and after the weather events of 2019"; 2) although there is evidence of interior water damage, "the majority of claimed damage is attributable to long-term wear and tear and deterioration due to aging"; 3) Service Master Extreme's water mitigation report is "unreliable"; 4) Mr. Carrell's estimate "is not reasonable. The restoration estimate scope should be limited to repair items to bring the [p]roperty to pre-loss condition after the storm event . . . . [Mr. Carrell's] estimate includes several items beyond the storm related damage"; and 5) "[t]he restoration estimate to make repairs to the interior and to bring the [p]roperty to pre-loss condition as the result of the water intrusion . . . would be $4,390.50, which is below the $15,316.00 deductible for the loss." Id. at 4-8.

34

2.      Legal Standard

Rule 702, which governs the admissibility of expert witness testimony, provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts and data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Moreover, as to reliability, the Court may consider numerous factors, including: whether a theory or technique has been "subjected to peer review and publication"; whether there are "standards controlling the technique's operation"; and "whether the theory or technique enjoys general acceptance within a relevant scientific community." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149-50 (1999) (quoting Daubert, 509 U.S. at 592-94) (internal quotations omitted).

3. Mr. Alexander's Trial Testimony

Here, plaintiffs argue that 1) Mr. Alexander should be precluded from providing trial testimony as to meteorological conditions at plaintiffs' residence, and 2) Mr. Alexander failed to use sufficiently reliable methodology in reaching any meteorological opinions and conclusions.  First, as the Court found in Part IV.a.2, supra, when determining damage causation (including hail and wind damage), an engineering expert may rely on relevant facts and data, such as weather reports, which confirm the presence of a severe storm at the residence.  Mr. Alexander was not using scientific, technical, or specialized knowledge to interpret weather data; rather, he reviewed data such as CoreLogic's hail and wind verification reports.  See Dkt. # 34-8, at 17-19.  The CoreLogic

reports consist of easy-to-read tables that any reasonable lay person could understand. See id. Mr. Alexander is not testifying to specialized meteorological knowledge--such as how storms or tornadoes are formed--he is merely comparing the observed condition of plaintiffs' roof, with reported weather conditions affecting the residence location, to determine whether plaintiffs' claimed roof damage was caused by a storm.

Second, plaintiffs fault Mr. Alexander for relying on "a cursory review of two weather reports[,]" which they argue is an inadequate investigation into the weather conditions that existed at the property on May 26, 2019. Dkt. # 32, at 3. In plaintiffs' reply in support of their motion (Dkt. 50), plaintiffs pivot and fault Mr. Alexander for relying on one weather data source only, CoreLogic, which plaintiffs argue is inadmissible hearsay. Dkt. # 50, at 2.

As a preliminary matter, the rules governing expert testimony make clear that an expert may rely on inadmissible evidence, such as hearsay, in forming his or her opinions and testifying to those opinions at trial. Next, as the Court found in Part IV.a.2, supra, expert testimony from a meteorologist is not necessary to establish that a severe storm affected plaintiffs' property on May 26, 2019. Moreover, defendant does not appear to dispute that a storm affected plaintiffs' property on May 26, 2019. See, e.g., Dkt. # 38, at 4 ("[n]one of the parties dispute that 70 mph wind occurred at the property in 2019"). Notwithstanding, the Court finds that Mr. Alexander's reliance on CoreLogic's weather verification reports seems reasonable–a scientist with a Ph. D. in meteorology discussed the technology and methods undergirding CoreLogic's weather verification reports in a 2017 article featured in a trade publication, including details about the precision and granularity of the reports. Moreover, plaintiffs present no evidence or argument to challenge CoreLogic's reliability under Daubert. In sum, the Court finds that plaintiffs' motion in limine as to limiting Mr.

Alexander's trial testimony with respect to weather conditions at plaintiffs' residence should be denied.

4.      Ms. Stokes' Trial Testimony

As a preliminary matter, based on defendant's response that Ms. Stokes will not be testifying regarding the cost to repair or replace plaintiffs' roof, the Court finds that that part of plaintiffs' motion in limine should be granted.

With respect to Ms. Stokes' opinion on the condition of the roof, plaintiffs argue that Ms. Stokes is not qualified to conclude that plaintiffs' roof was in substantially the same condition both before and after the weather events of 2019, and insofar as she is merely comparing photographs of plaintiffs' roof from 2016 and 2019, Ms. Stokes' opinion is not helpful to the jury. Dkt. # 32, at 4-5. Specifically, plaintiffs argue that identifying hail and wind damage requires specialized knowledge and technical skills. Id. at 4.   However, identifying hail and wind damage to the roof was not necessary for Ms. Stokes' opinions.   Reading her first and second conclusion together, Ms. Stokes opines that based on the deteriorated condition of plaintiffs' roof, both in 2016 and in 2019, the interior water damage was due to water infiltration and excess humidity over long periods of time, rather than sudden and accidental water intrusion.   The Court finds that, based on  Ms. Stokes' experience and professional certifications, she is qualified to form expert opinions as to interior water damage, including its causes.  Further, the photographs of plaintiffs' roof conditions in 2016 and 2019 formed part of the "sufficient facts and data" on which Ms. Stokes relied to determine the cause of plaintiffs' interior water damage.   Her analysis of the roof condition photos provide necessary context to the jury in order to assess the credibility of her expert testimony.   Moreover,

plaintiffs will have the opportunity to cross-examine the bases for Ms. Stokes' expert opinions at trial.

In sum, the Court finds that plaintiffs' motion in limine (Dkt. # 32) should be denied in part as to precluding Mr. Alexander from testifying to weather conditions at plaintiffs' residence based on his evaluation of relevant facts and data; denied in part as to limiting Ms. Stokes' testimony, based on her review of relevant facts and data, that the deteriorated condition of plaintiffs' roof caused the majority of the interior water damage; and granted in part as to precluding Ms. Stokes from testifying as to the cost to repair or replace plaintiffs' roof.

c.      *Defendant's Omnibus Motion in Limine*

Defendant moves in limine to exclude from evidence certain issues and to direct plaintiffs' counsel "to refrain from offering any evidence, posing any question, and making any statement or comment regarding such matters in the presence of the jury." Dkt. # 31, at 1. Specifically, defendant moves to exclude seven items: 1) "any evidence of damages allegedly suffered by [p]laintiffs that have not previously been disclosed"; 2) "testimony regarding or referenc[ing] any of [State Farm]'s advertising, mottos, or slogans"; 3) "mentio[n] [of] the Unfair Claims Settlement Practices Act"; 4) "golden rule arguments"; 5) "statements or references to any discovery, motions, or pretrial disputes"; 6) argument as to State Farm having a fiduciary duty; and 7) "discussi[on] [of] post-litigation activities of counsel, including the suggestion that State Farm acted in bad faith by redacting attorney-client privilege and/or work product from the claim file." Dkt. # 31, at 2-11.

1.      Evidence of Plaintiffs' Damages That Have Not Been Disclosed Previously

Defendant argues that, pursuant to Rule 26 disclosure requirements, plaintiffs should be precluded from alleging any breach of contract damages exceeding the amount provided by plaintiffs

during discovery.  Id. at 2.  Defendant further argues that plaintiffs should also be "precluded from alleging or presenting evidence that they incurred a specific amount or range of damages for [D]efendant's alleged bad faith."  Id. at 3.  Finally, defendant requests that "Mr. Carrell's estimate that relates to mold damages [] be excluded."  Id. at 4 n. 1.

As a preliminary matter, the Court found in Part III, supra, the defendant's motion for partial summary judgment as to the issue of mold-related damages, plaintiffs' bad faith claim, and the issue of punitive damages should be granted.  Therefore, defendant's motion in limine as to alleging or presenting evidence regarding mold-related damages, bad faith, or punitive damages should be granted in accordance with this opinion.

As to contractual damages, plaintiffs provided notice to defendant in their Rule 26 disclosures that they are seeking contractual damages in the amount of $538,952.68 for the replacement cost value of the roof and interior property.  Id. at 3.  Since then, plaintiffs have, through their expert disclosures, notified defendant that they have retained Pat Carrell "as an expert to testify at trial regarding his estimate and quantification of" the replacement cost value "of [p]laintiffs' alleged damages total[ing] approximately $268,565.00 after [p]laintiffs' deductible[.]" Id. at 4. Notwithstanding, the expert report provides an estimate of the net cost of replacing plaintiffs' roof as of August 2021.  The estimate does not, for example, reflect the replacement cost value of plaintiffs' roof in 2022, which would account for inflation and other circumstances that may influence the actual cost of replacing plaintiffs' roof.  However, the expert report provides defendant with adequate notice--for purposes of Rule 26 disclosures--of the approximate amount of actual damages plaintiffs seek for their breach of contract claim.  Therefore, the Court finds that

defendant's motion in limine  should be denied as to plaintiffs alleging contract damages that exceed the amount disclosed in their Rule 26 disclosures.

    2.    Any Reference to State Farm's Advertising, Mottos, or Slogans

Defendant argues that the "use of [State Farm's] slogan has no probative value and would be designed solely to unfairly prejudice the jury against [State Farm]." Id. at 5.  Plaintiffs respond that defendant "has embedded its company slogan and motto into its claims handling department . . . [Thus,] the representations and assuring slogans [defendant] fully embraced and utilized to sell [plaintiffs an insurance policy] are relevant in this action and are an inherent part of the duty" to act in good faith and deal fairly with plaintiffs.  Dkt. # 39, at 6.

The Court found in Part III, supra, that defendant's motion for partial summary judgment on plaintiffs' bad faith claim should be granted.  Here, plaintiffs argue that State Farm's advertising, slogans, and mottos are relevant to their bad faith claim, which is no longer at issue in this case. Moreover, State Farm's advertising, slogans, and mottos have no relevance as to plaintiffs' breach of contract claim; i.e., State Farm's advertising, slogans, or mottos have no tendency to make a fact of consequence more or less probable with respect to whether plaintiffs' roof damage entitles them to the full replacement cost value of a total roof replacement under the policy.  See Fed. R. Evid. 401.  Therefore, defendant's motion in limine as to testimony regarding or referencing any of State Farm's advertising, mottos, or slogans should be granted.

    3.    Mention of the Unfair Claims Settlement Practices Act

Defendant argues that Oklahoma law "recognizes that it is *improper* for a jury to consider the [Unfair Claims Settlement Practices Act (UCSPA)]."  Dkt. # 31, at 6 (emphasis in original). Plaintiffs respond that defendant's motion should be denied "because the UCSPA is informative to

[p]laintiffs' bad faith claim and provides guidance regarding the same[.]" Dkt. # 39, at 7. The Court finds that, because plaintiffs' bad faith claim is no longer at issue, defendant's motion should be granted.

4.      Golden Rule Arguments

Defendant moves to preclude any golden rule arguments, which are "universally recognized as improper, because [they] encourag[e] the jury to depart neutrality and to decide the case on the basis of personal interest and bias rather than evidence." Dkt. # 31, at 7 (internal quotations omitted). Plaintiffs respond that they agree with defendant that golden rule arguments should not be permitted at trial. Dkt. # 39, at 7. However, plaintiffs argue that defendant has "expanded the meaning of a 'golden rule argument' by utilizing examples that reach beyond simply asking a jury to place themselves in the shoes of a named party"; for example, "[d]efendant seeks to prohibit [p]laintiffs from asking the jury 'to consider what they would want if this was their family or their home[.]" Id. According to plaintiffs, they should be permitted to ask the jury to consider its community; that such a request is not asking members of the jury to put themselves in the shoes of a party. Id. The Court finds plaintiffs' argument nonsensical--asking the jury to consider what if it was their family or their home or community is exactly the kind of golden rule argument that impermissibly invites the jury to decide a case based upon personal interest and bias. See Burke v. Regalado, 935 F.3d 960, 1030-31 (10th Cir. 2019). Thus, the Court finds that defendant's motion in limine as to golden rule arguments should be granted, which includes asking members of the jury to consider if it were their family, their home, their community, and so forth.

41

5.      Statements or References to Discovery, Motions, or Pretrial Disputes

Defendant argues that "[a]ny reference to discovery motions, discovery disputes, or other disputes is not relevant to the merits of this case." Dkt. # 31, at 8.  Plaintiffs respond that although they "do not generally object to [d]efendant's motion[,]" plaintiffs request that the Court reserve its ruling until trial and that it is "unnecessary to make a blanket prohibition at this time[.]" Dkt. # 39, at 8.  The Oklahoma Court of Civil Appeals has found that "an insurer's litigation tactics and strategy in defending a claim are not relevant to the insurer's decision to deny coverage[.]" Sims v. Travelers Ins. Co., 16 P.3d 468, 471 (Okla. Civ. App. 2000).  In other words, defendants litigation conduct, including discovery motions, discovery disputes, etc. are not relevant to plaintiffs' breach of contract claim.  The Court fails to see how the passage of time would make defendant's litigation conduct more or less relevant to plaintiffs' breach of contract claim, and plaintiffs cite to no authority supporting their position.  Notwithstanding, the Court reminds plaintiffs that rulings on motions in limine are preliminary and "subject to change when the case unfolds[.]" Luce v. United States, 469 U.S. 38, 41 (1984).  In sum, the Court finds that defendant's motion in limine as to statements or references to discovery, motions, or pretrial disputes should be granted.

6.      Argument as to State Farm Having a Fiduciary Duty

Defendant argues that plaintiffs "have asserted a claim for a violation of the duty of good faith and fair dealing, *not* a breach of fiduciary duty. . . . Accordingly, [p]laintiffs should be precluded from alleging State Farm had a fiduciary duty." Dkt. # 31, at 10 (emphasis in original).  The Court agrees.  Plaintiffs' response is rooted in defendant's implied duty of good faith and fair dealing, see Dkt. # 39, at 8-9, and the Court granted summary judgment on plaintiffs' bad faith claim.  Moreover, breach of a fiduciary duty is a claim that is distinct from breach of the duty of

good faith and fair dealing.  See Cosper v. Farmers Ins. Co., 309 P.3d 147, 150 (Okla. Civ. App. 2013) ("the existence of the duty of good faith and fair dealing implied in insurance contracts does not necessarily mean [p]laintiffs' petition states a claim for breach of fiduciary duty").  Therefore, any reference to State Farm having a fiduciary duty is 1) not relevant to plaintiffs' breach of contract claim; and 2) would impermissibly prejudice State Farm by creating a risk of confusing the issues or misleading the jury.  Accordingly, the Court finds that defendant's motion in limine as to any reference to State Farm having a fiduciary duty should be granted.

7.     Post-Litigation Activities of Counsel

Defendant argues that "[a]ny evidence relating to actions taken by [d]efendant's counsel in the course of litigation, such as asserting privileges with respect to certain documents, is not relevant to any issues in this lawsuit."  Dkt. # 31, at 11.  Plaintiffs respond that they "do not challenge [d]efendant's proposed prohibition on discussing the post-litigation activities of counsel."  Dkt. # 39, at 9-10.  The Court finds that, because plaintiffs do not object to defendant's motion to exclude any evidence as to post-litigation activities of counsel, defendant's motion should be granted.

**IT IS THEREFORE ORDERED** that defendant's motion for partial summary judgment (Dkt. # 34) is **granted** in accordance with this opinion and order.

**IT IS FURTHER ORDERED** that defendant's motion to limit testimony of retained and non-retained experts (Dkt. # 29) is **granted in part** as to limiting plaintiffs to one engineer witness testifying to the presence of wind or hail damage to plaintiffs' roof and whether the roof required replacement; **granted in part** as to excluding those parts of Dr. Kloesel's testimony that are cumulative to Mr. Martin's testimony, or are unnecessary and/or unhelpful for the jury to determine whether plaintiffs' roof damage is covered, storm-caused damage; **granted in part** as to precluding

expert testimony that is relevant to plaintiffs' bad faith claim only; **granted in part** as to limiting plaintiffs' retained experts' trial testimony to the opinions (and the reasons and bases for those opinions) contained in their expert reports; **denied in part** as to a blanket exclusion of expert testimony pertaining to insurance coverage or policy issues; **granted in part** as to limiting Mr. Cannon and Mr. Williams' trial testimony to lay witness testimony and precluding plaintiffs from referring to either witness as an "expert."

**IT IS FURTHER ORDERED** that plaintiffs' motion in limine (Dkt. # 32) is **denied in part** as to precluding Mr. Alexander from testifying to weather conditions at plaintiffs' residence based on his evaluation of relevant facts and data; **denied in part** as to limiting Ms. Stokes' testimony, based on her review of relevant facts and data, that the deteriorated condition of plaintiffs' roof caused the majority of the interior water damage; and **granted in part** as to precluding Ms. Stokes from testifying as to the cost to repair or replace plaintiffs' roof.

**IT IS FURTHER ORDERED** that defendant's omnibus motion in limine (Dkt. # 31) is **granted in part** and **denied in part** in accordance with this opinion and order.

**DATED** this 11h day of July, 2022.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

44